J-S25009-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.I.S., JR., A MINOR | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| | : | |
| APPEAL OF: K.T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 60 MDA 2019 |

Appeal from the Order Entered December 6, 2018
In the Court of Common Pleas of Centre County
Orphans' Court at No:  2018-4322 A

BEFORE:  STABILE, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.:                    **FILED JULY 05, 2019**

K.T.D. ("Mother") appeals from the December 6, 2018 decree in the Court of Common Pleas of Centre County involuntarily terminating her parental rights to her son, M.I.S., Jr. ("Child"), born in August of 2013.  We affirm and grant counsel's petition to withdraw.

The record reveals that Child was placed in the emergency custody of the Centre County Office of Children and Youth Services ("CYS") on September 18, 2017, due to Mother and M.S., Sr. ("Father"), being unresponsive in the home of W.S. ("paternal grandmother") the previous evening, when Child was present, and police finding drug paraphernalia in plain sight in their home. N.T., 12/5/18, at 16.  The court adjudicated Child dependent on September 25, 2017.  On October 6, 2017, the court found aggravated circumstances existed as to Mother due to the involuntary termination of her parental rights

to her daughter. *Id.* at 24; Dependency Adjudication at ¶ 18. The order directed no reunification efforts between Mother and Child.

In addition to Child, Mother has two older sons and a daughter. Mother's first son was born in 2003. Mother gave birth in the State of New Jersey to her second son and to her daughter in 2008 and 2012, respectively, both of whom tested positive at birth for phencyclidine ("PCP"). Dependency Adjudication at ¶¶ 15-16. As a result, the New Jersey Division of Child Protection and Permanency ("DCPP") had an extensive history with Mother. As best we can discern, Mother's sons reside in the permanent legal custody of her sister in New Jersey. *Id.* at ¶ 15. Mother's daughter was immediately placed in the custody of DCPP, and the Superior Court of New Jersey involuntarily terminated her parental rights to that child in 2016. *Id.* at ¶¶ 16, 18.

In 2012, Mother moved to the State of Colorado, where Child was born also with PCP in his system. N.T., 12/5/18, at 25. Child was immediately placed in foster care in Colorado, where he remained for approximately the first year of his life. *Id.* at 25-26. Thereafter, a Colorado court returned Child to the care of Father, who was to supervise Mother in the presence of Child. *Id.* at 26.

CYS first became aware of Mother living in Centre County, Pennsylvania, in May of 2017, upon a referral from DCPP. When CYS subsequently became involved with this family in September of 2018, Child's paternal grandmother

alleged that she had been caring for Child for approximately one and one-half years. N.T., 12/5/18, at 27; Dependency Adjudication at ¶ 21. CYS determined that the paternal grandmother was not a proper placement for Child because of her own drug use and health problems. N.T., 12/5/18, at 21-22, 27. Therefore, CYS placed Child with foster parents, with whom he remained throughout this case. They are a permanent resource for him. *Id.* at 86.

On July 30, 2018, CYS filed a petition for the involuntary termination of Mother's and Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). A hearing occurred on December 5, 2018, during which CYS presented the testimony of its caseworkers, Lacy Gates and Tammi Eddy, and the caseworker from Family Intervention Crisis Services ("FICS"), Jessica DuFour. Mother did not appear at the hearing, but she was represented by counsel.[1] Father was represented by counsel, and he testified on his own behalf. In addition, Child, then five years old, was represented by legal counsel during the hearing.

By decrees dated December 5, 2018, the orphans' court involuntarily terminated Mother's and Father's parental rights. On January 4, 2019, Mother, through her trial counsel, filed a notice of appeal and a concise

---

[1] At the conclusion of the hearing, the orphans' court granted Mother's trial counsel permission to withdraw as counsel but directed counsel to advise Mother immediately of her appeal rights. N.T., 12/5/18, at 138.

statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Father did not appeal.

On January 10, 2019, the court appointed appellate counsel for Mother, who subsequently filed a petition with this Court requesting to withdraw from representation and submitted a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967) and *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009).[2] We review counsel's request to withdraw first. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) ("'When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.'") (quoting *Commonwealth v. Smith*, 700 A.2d 1301, 1303 (Pa. Super. 1997)).

To withdraw pursuant to *Anders*, counsel must:

1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa. Super. 2009)). With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court

---

[2] This Court "extended the *Anders* principles to appeals involving the termination of parental rights." *In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014).

has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, an *Anders* brief must comply with the following substantive requirements:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

Instantly, Mother's counsel filed a petition to withdraw certifying that he had reviewed the case and determined that Mother's appeal was frivolous. Counsel also filed a brief that includes a summary of the history and facts of the case, the issues raised by Mother, the facts that arguably support the appeal, and counsel's assessment of why the appeal is frivolous with citations to relevant legal authority. In addition, counsel attached to the petition his

- 5 -

letter to Mother dated March 20, 2019, pursuant to **Millisock**, **supra**.[3] As such, counsel complied with the requirements of **Anders** and **Santiago**.

We must next "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." **Commonwealth v. Flowers**, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted). Counsel's **Anders** brief raises the following issues for our review:

> [I]. Whether the [orphans'] court erred in finding clear and convincing evidence existed to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. [§] 2511(a)(1), (2), and (5) where no assessments were conducted and [CYS] failed to demonstrate that termination was in the best interest of Child?
>
> [II]. Whether the [orphans'] court erred in terminating Mother's parental rights where insufficient evidence was presented to meet the requirements of the grounds submitted?

**Anders** brief at 7.[4]

Our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

---

[3] On May 7, 2019, Mother filed *pro se* a one-page handwritten letter to this Court in which she alleges, as best we can discern, that her appellate counsel and CYS verbally abused, insulted, and caused her mental anguish. In addition, she alleges that she does not know why Child was removed from her care. Upon careful review of the record, discussed *infra*, Mother's assertions are unsupported and entitle her to no relief.

[4] It is important to note that Child's legal counsel has filed a brief in support of the subject decree.

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we conclude that the certified record supports the decree pursuant to Section 2511(a)(1) and (b), which provides as follows.[5]

---

[5] This Court need only agree with any one subsection of Section 2511(a), along with subsection 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
. . .

23 Pa.C.S.A. § 2511(a)(1), (b).

With respect to Section 2511(a)(1), our Supreme Court has held,

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

***In re Adoption of Charles E.D.M.***, 550 Pa. 595, 602, 708 A.2d 88, 92

(1988).  Further,

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and

consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

Our courts have explained that parental duty "is best understood in relation to the needs of a child." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977).

A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

*Id.* (citations omitted); *see also In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004).

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the

particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

In this case, the testimonial evidence demonstrates that Mother refused or failed to perform her parental duties in excess of six months immediately preceding the filing of the involuntary termination petition pursuant to Section 2511(a)(1). Lacy Gates, the CYS caseworker from September 18, 2017, until October 30, 2017, testified that Mother was obligated under a Family Service Plan ("FSP") developed by DCPP in New Jersey to participate in drug and alcohol counseling. N.T., 12/5/18, at 40. Ms. Gates testified that CYS had contact with Mother, as follows.

> [Mother] would call into the office, and . . . would speak to me about going back to September 18th and how she didn't do it and it was just she would go around and around in a circle and we would get nowhere. And I'd eventually terminate those calls because we weren't getting anywhere and she wasn't following through as far as I knew with anything in New Jersey.

*Id.* Ms. Gates testified that Mother would not sign releases, so she had no knowledge that Mother ever participated in the required drug and alcohol counseling. *Id.*

Tammi Eddy, the CYS caseworker from October 30, 2017, up through the time of the subject proceeding, testified that CYS presented Mother with a copy of the permanency plan.[6] Ms. Eddy stated that she spoke to Mother

---

[6] Although not specified in the record, we presume that the permanency plan was established by DCPP.

soon after she became the caseworker, during which "[Mother] informed me that she was not in agreement with the plan and had no intention of following through with it because it was lies." *Id.* at 76. She further explained, "[Mother] frequently goes back to the day, September 18th of last year, denies that she was abusing her prescriptions. She said we're using her past against her. And she . . . [verbally] attacks caseworkers and CYS staff[.]" *Id.* at 78. Ms. Eddy stated that Mother's moods generally vacillated between being "very angry, very hostile and verbally combative." *Id.* at 77. Specifically, Ms. Eddy testified:

> On a personal basis, among other things she has called staff members fat, stupid, lazy. She, at one point, told me that I was a racist. She accuses CYS staff of purposefully antagonizing her. At one point she said to me, she told me that I was lying about having other clients, that I had no other clients but her, and that I spent my time following her around and keeping tabs on her.

*Id.*

Ms. Eddy testified that, in all but two telephone calls she had with Mother, Mother seemed "to be under the influence of some kind of substances. . . ." *Id.* at 77. Similarly, she testified that, between July 24 and July 26, 2018, Mother left three voicemails for her in which Mother's speech was slurred. *Id.* In two of her voicemails, Mother "made a reference to living in a dangerous area, and [she] said that she had been shot at." *Id.*

Ms. Eddy testified that, at a hearing on October 30, 2017, the juvenile court directed CYS to provide supervised visits for Mother at her request. *Id.* at 71-72. Mother requested four visits between October 30, 2017, and

December 8, 2018, and CYS scheduled them. Mother attended none of the visits. *Id.* at 72-74. She also testified that Mother had telephone conversations with Child on January 8, 2018, and July 30, 2018, the latter of which she "struggled to stay on child-friendly topics. . . . She had to be advised several times that she needed to . . . stick to things that were child[-]friendly. . . ." *Id.* at 74. For instance, Ms. Eddy stated that Mother "repeatedly asked Child who was hurting him in foster care. Child told her nobody's hurting me, nobody's hurting me. . . ." *Id.* at 75.

By letter dated August 14, 2018, Ms. Eddy informed Mother that she investigated Mother's claim that Child was being abused in foster care, and she concluded it was not accurate. *Id.* at 79. Further, Ms. Eddy informed Mother "that phone calls would no longer be substituted for a face-to-face visit. And that if she would like to have visits with [Child], she needed to make those arrangements." *Id.* Based on all of the foregoing, Ms. Eddy testified, "It's our position that [Mother has] made absolutely no progress [on her FSP goals in the DCPP permanency plan]." *Id.*

The testimonial evidence clearly demonstrates that Mother has refused or failed to perform her parental duties throughout the entirety of the underlying case, which was more than ten months preceding the filing of the termination petition. As such, we discern no abuse of discretion by the court in concluding that Mother's conduct warrants the termination of her parental rights under Section 2511(a)(1).

We next review the decree under Section 2511(b) pursuant to the requisite bifurcated analysis in involuntary termination matters. Our case law is well-settled:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. **In re K.K.R.S.**, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. **See In re T.D.**, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." **In re Adoption of T.B.B.**, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in **In re A.S.**, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **In re T.S.M.**, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." **Id.** at 269. The **T.S.M.** Court

observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, the testimonial evidence does not reveal the existence of any bond between Mother and Child. Therefore, to the extent that the orphans' court inferred that no parent-child bond existed, it was reasonable. *See In re K.Z.S.*, 946 A.2d at 762-763.

Ms. Gates testified on cross-examination by Child's counsel that Child was more bonded to his paternal grandmother than to his parents at the beginning of his foster care placement. N.T., 12/5/18, at 41-42. For instance, she testified that Child inquired about his paternal grandmother, but not his parents, when she was the caseworker. *Id.* at 43.

Nevertheless, Ms. Gates testified that Child, "fit right in with everybody [in the foster home]. Even on the first night that we brought him to that home, he was right off playing with the two children that are close to his age." *Id.* Similarly, Jessica DuFour, the FICS caseworker, who offered reunification services to Father and Child's paternal grandmother, testified that she observed Child in the foster home and described him as "a very happy kiddo. He's doing well there. They're meeting all of his needs. He seems comfortable in that living situation." *Id.* at 51.

Ms. Eddy testified that Child refers to Mother by her first name. *Id.* at 75. Further, she testified Child told her that he did not trust Mother, but he

"identified the foster parents and their adult son as three adults that he feels safe with and can trust to tell if somebody's harming him." ***Id.*** In fact, Ms. Eddy testified that Child refers to his foster parents, who are a permanent resource, as "mommy and daddy." ***Id.*** at 86.

Ms. Eddy testified that Child participates in counseling every six weeks "just for maintenance." ***Id.*** at 85. She explained:

> He's doing extremely well. We had referred [Child] because it seemed odd to us that given all the trauma that he has endured in his young life that he is as well[-]adjusted as he is. [The counselor] sees no concerns of [Child] at this point[;] he's doing very well. So she's seeing him for maintenance appointments once every six weeks.

***Id.*** Further, Ms. Eddy testified that Child was "doing extremely well" in kindergarten. ***Id.*** She stated:

> He frequently gets awards, they're called star awards, for various things. His most recent one was for reading. He told us it was for reading 77 books. That wasn't true, it was seven. He just got a little carried away. He's gotten them for good behavior, good citizenship. His teacher describes him as the quintessential kindergartner. The school just has nothing but positive things to say.

***Id.***

Moreover, Ms. Eddy testified that Child would not be harmed if Mother's parental rights are terminated. She stated, "in addition to his emotional stability, I would be much more concerned about his physical safety [if he was] with his biological mother." ***Id.*** at 87.

We conclude that the testimonial evidence overwhelmingly demonstrates that terminating Mother's parental rights will best serve Child's

developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).  In addition, our independent review of the record reveals that there are no other additional, non-frivolous issues overlooked by counsel. Accordingly, we affirm the decree.

Petition of Julian Allatt, Esquire, to withdraw from representation is granted.  Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 07/05/2019